Pleased to have you here. We'll proceed to argument in the Radiance Foundation v. NAACP. Good morning, Your Honor. May it please the Court, my name is Charles Allen. I represent the Radiance Foundation, Inc. and Ryan Bomberger in this appeal, in this matter. The central question in this matter is may a mark owner prevail in a trademark infringement action against another where the use of the mark holder's mark alleged to be infringing is the use of the mark and as a satirical parody of the mark holder's mark solely to express criticism of the mark holder in the title and the text of a published news article. I submit that the Lanham Act does not permit such an action and the First Amendment precludes it. Now, in this case, Radiance Foundation, which is a nonprofit organization that provides, among other things, news and commentary on various issues, social issues, from a Christian perspective, and Ryan Bomberger, the Radiance Chief Creative Officer, and I will refer to them simply as Radiance, use the mark NAACP, as well as the phrase National Association for the Abortion of Colored People, to communicate criticism of the NAACP for its support of abortion. The articles were published at websites operated by Radiance at webpages that can be located by the URLs that do not use and are not similar in any way to any of the NAACP's marks. Now, the URL is that address that allows us to locate the website in question. So, in this case, at the URL theradiancefoundation.org, the article was one of 80 news articles posted at that location or at that address. And at the URL toomanyaborted.com, the article was one of 115 news articles located at that location. After receiving a cease and desist letter from the NAACP, Radiance filed a declaratory judgment action against the NAACP. The NAACP responded with counterclaims, asserting both trademark infringement and trademark dilution. And after a bench trial in Norfolk, the district court found both infringement and dilution and entered a permanent injunction against Radiance. Radiance thereafter filed this timely appeal. Your article was something of a cheap shot, wasn't it? No, Your Honor, it was fair commentary. And the fact that it may be hard and stinging made it, and the evidence shows in this case, made it effective. Where in other circumstances, the commentary and criticism of others who had criticized the NAACP for abortion didn't have the same effect. Of course, being for reproductive choice and being for abortion are two completely distinct and different things. I don't, Your Honor, I would submit that they're not necessarily two completely different things, and that reasonable people would have different viewpoints about that, which makes this a fair debate, and makes it a debate that ought to be allowed under the First Amendment. So simply because an entity says we are in favor of women's health choices can, in fact, be the substance of a debate about- that the name was put in the- the takeoff on the name was the title of the article. Does that make a difference as opposed to it being somewhere in the body of the article? No, Your Honor, I don't believe it does. I would submit that the amicus, the Electronic Frontier Foundation, and the ACLU of Virginia, I would submit that it does make a difference, and that the difference weighs in favor of permitting such parodies to be in the title. That the title is an expressive phrase that's used to connote what is in the text of the article, and that it has to be catchy, and it has to be the kinds of things that would grab a reader's interest in order to get them there. So they have argued, and I would submit that they are correct on that point, that this is different in one respect, but it's different in favor of the Radiance Foundation, not in favor of suppressing it as trademark infringement or trademark dilution. Can I give you a chance to address what I think is one of the sort of arguments being made against your position, which is that all you would have to do to eliminate any possibility of confusion here is to say, you know, NAACP might as well be called National Association for the Abortion of Colored People. It's as though it were. I mean, you'd only have to add one or two words, which apparently you did in prior postings. So what's the big First Amendment harm in requiring that, given that on the other side of the balance, you really can eliminate any possibility of confusion? Well, first, Your Honor, the First Amendment doesn't require that the person making the commentary has to use the words that will best eliminate any confusion. And the question here is whether or not there is confusion about goods and services or the source of goods and services for the purposes of trademark infringement. Your answer is there is no risk of confusion regardless. What if somebody thought there were? I guess I'm asking you, what if, just assume for a moment, someone thought there were at least a risk of confusion? And we do have the survey results and everything. I mean, is there a real First Amendment cost on the other side of the balance in saying you should just clarify, use a few words to clarify? But there is no First Amendment issue there on the other side that I see. The First Amendment allows the speaker to make harsh and critical and stinging criticism. It doesn't require that they go on to mollify that or soften it by saying, well, the organization's name is really something else, but we're just using this to do our criticism. The First Amendment can't be so easily set aside for a radiance foundation by saying, here, let us tell you what you have to write in order to make this. If there is legitimately a trademark infringement or trademark dilution action, then, yes, a disclaimer would be inappropriate. But in this case, there is not. And the reason there is not is because they don't satisfy for trademark infringement, they don't satisfy the in connection with requirement. The in connection with requirement exists in both Sections 32 and 43A of the Lanham Act. And they provide that use of the mark must be in connection with the sale, the offering for sale, the distribution or the advertising of goods and services. That's Section 32. 43A uses slightly different words. Does the donate button make this in connection with goods and services? It would, Your Honor, if the URL was where the infringing mark occurred. And that's PETA and Buki and Use for Jesus and United We Stand and all those cases where either it's the name of the entity or the URL, the URL, which is where the infringement occurs. But because it occurs in the text, it does not. Proximity alone of the use of the mark with an advertisement or a request to donate cannot be the basis for infringement. If so, every article in the Richmond Times Dispatch would suffer from that very same malady, as would any news article in a news magazine. Proximity is not the question. The question is whether or not. So you don't think it matters where the donate button is placed? It does in this sense, Your Honor. It matters if you can make a connection between the donate button and the infringing use of the mark. Would it matter to you if the donate button was placed above the article? No. It would not if the URL was still the RadianceFoundation.org, and it was clearly in a news article on the page. If you look on the page, and so the court has it, it's on the Radiance site. It said the joint appendix 869. But if you look on the page, not only is there a donate button, right above the donate button, there's a little thing that says connect with us, and then there's a block for Facebook. I thought part of your position was that under Village of Schoenberg that charitable solicitations are not pure commercial speech. If it's a charitable solicitation for, in this instance, a nonprofit with a particular political point of view, I thought your general position was that charitable solicitations under Village of Schoenberg don't bring it outside of the ambit of First Amendment protection. That is our position, Your Honor, that that charitable solicitation is entitled to protection because it isn't true commercial speech. But the in connection with requirement of the Lanham Act has been very broadly, as the NAACP has described, capaciously interpreted. And so I think in this particular case, though, this is beyond the outer limit of that interpretation because the donate button, when you have a URL that is the infringing mark, it is fair for the user to assume that the URL pertains to everything, the content there. Now you're talking about confusion. I feel like you're going back and forth from is it in connection with goods and services to, well, if it's not in the URL, it might be in connection with goods and services, but no one will be confused. Those seem like two different points. They are two different points, Your Honor. Okay. In connection with, the requirement for the Lanham Act violation is that it must be in connection with and it must be likely to be. Right, right. But I'm saying, but it clearly is in connection with. It's right next to the donate button. And the whole heart of their claim is that people will think, oh, the NAACP wants me to donate. I like the NAACP. I'm hitting the button. I respectfully disagree, Your Honor. The top of the URL, the URL says who owns that page. And the content, all of the content on that page, I think people would reasonably say has some. That goes to confusion. And I totally understand your point about confusion. But I don't, I'm just not understanding your argument for how a donate button next to the mark is not in connection with, how is the mark not in connection with the donate button? Because the use of the marks in the text of the article have no association. There is no nexus between the use of the marks in the article and that donate button. Now, I also agree that in this particular case the evidence is insufficient. I assume that you want people, their argument is that people will think the NAACP wants me to donate. I'm hitting the button. But I assume that you want people to read the article not like the NAACP and hit the button. How is it not in connection with hitting the button? Well, in that sense, it is in connection with. But that is not trademark use in connection with. I'm not using their mark. It is perfectly legitimate under the Schomburg case and other cases, and that would be nominative fair use. It's perfectly permissible to say give to me in order to stop the Democratic National Party from electing people. That's perfectly fair nominative fair use. Exactly. It's in connection with, but it is fair use. So it's not a problem. I would argue it's not in connection with because you're not using it for those goods and services. But it's also protected under Schomburg. But your point is this is in connection with social commentary and not in connection with goods or services. Exactly. And to the extent that a mark is being used to sort of support the general social commentary, it is the radiance mark that is being used for that purpose, not any marks of the NAACP. So you, and as I understand it, part of your argument was that you have to separate, you know, looking at Alpita case, you have to separate something that's the title of a news article from something that's a domain name with all kinds of links. And that the title of a news article and a domain name are simply apples and oranges. Exactly, Your Honor. And moreover, those cases that use domain names for finding and connection are analogous to those cases that use the name of the entity. So cases like United We Stand where the organization names itself United We Stand cannot stand and say, we're not using that name in connection with goods and services. They most certainly are. But if you're using it in social commentary as a title and you're using the mark in the text, that can't be in connection with. That is not in connection with goods and services. Those are simply being used as social commentary and criticism. They're expressive. And they deserve the full protection of the First Amendment. And in this case, that's what was not afforded. And it's afforded. That protection is afforded, I would submit, by the in connection with requirement, not by the confusion requirement. We can be confused by legitimate free speech. That's not actionable under the Lanham Act. It's actionable only if it's used in connection with. In this particular case, it was not. I also want to address very briefly, in the remaining time I have, the dilution argument. This was clearly news commentary and news reporting. And the defense language in the statute that provides for the exception for this simply says, the following shall not be actionable as dilution by blurring or dilution by tarnishment in all forms of news reporting and news commentary. Now, this was plainly news reporting and news commentary. There is no requirement in the statute or in any of the case law that the news reporting and news commentary be from a news media outlet, which is the argument that the NAACP raises to say that this wasn't news reporting or news commentary. And in this particular case, this is plainly news reporting and news commentary. The text of the article refers to an event that was taking place contemporaneous or nearly contemporaneous with the article, the image award ceremony. It refers to the ongoing debate about whether or not the NAACP is in favor of abortion, supports abortion, is in bed with Planned Parenthood, all of those things. It is news commentary. And simply because it comes from an organization that has a social perspective and provides other goods and services doesn't render this not news reporting and news commentary. So for that. Let me ask my co-panelists if they have some questions. Thank you, sir. We appreciate it and we'd like to hear from the other side. Thank you. May it please the court, Pratik Shah for the NAACP. The First Amendment does not render the provisions of the Lanham Act null and void just because an infringer uses trademarks in conjunction with matters of public concern. Congress has carefully crafted the Act to account for First Amendment considerations in a more nuanced way. With respect to trademark dilution, for example, the Act provides three discreet exceptions based on the First Amendment. But the Act provides no such defenses with respect to infringement where First Amendment interests, such as parity, are instead accommodated through the likelihood of confusion standard. The line between protected speech and trademark infringement is crossed where, like here, an unpermitted use of a mark causes consumer confusion. With respect to the consumer confusion, how does a consumer get something confused with the NAACP that is robustly and highly critical of the NAACP? I mean, you can roll out all the experts you want, but just looking at the article, it's unbelievably sharp. And you don't need to read all of it in the first paragraph to know that this organization comes close to being a mortal enemy of the NAACP. And if we confuse criticism with confusion, that seems to me to lead down a problematic path. I mean, how does that work if it's by its nature so critical? Sure. So, Your Honor, let me answer, start by saying that I think it's helpful to take a step back. Sure, if you read this article, as lawyers and judges do in the context of litigation, you read this thing, you study it, it becomes, I agree with you, it becomes hard to understand exactly how people could confuse this as possible sponsorship or affiliation with the NAACP. But the context in which this comes is Internet browsing. People are quickly browsing the Internet. And in the survey, to make sense of why 13% actually found sponsorship, affiliation, or approval, they were instructed... There's always got to be some level of it. But I think the question here is whether the, whatever minimal level of confusion there is, can be allowed to trump a very important First Amendment principle. And the other thing is the title of the news article is not used as a product identifier. They're not, I mean, they're not, there's no product identification here. This is a news article. Sure. Your Honor, well, a couple things... Or commentary more. Sure. So, a couple of things. First, again, I think it's helpful to look at the Exhibit 869. And the first thing you see is not just the title. You obviously have the prominent header, which is NAACP National Association for the Abortion of Colored People. But the most prominent thing on that webpage, when you're browsing on the Internet, when you look on page 869, it may be the title, but it's not even the title I would submit. It's the graphic that appears right under it. And if you view that graphic right under it, it has NAACP in huge, bold letters, National Association for the Abortion of Colored People, right next to a black and beautiful too-many-aborted.com. If someone is browsing on the Internet, comes across this article, as many people do on the Internet, they pay attention to the title, they pay attention to the graphic, it then becomes less inconceivable that someone could see that graphic, notice it right next to the billboard and think... But that's their message. The thing that makes the message pungent is the riff on the title. That's what makes people take notice. And that's what the First Amendment is supposed to be. It's supposed to be speech that causes people to take notice. And if you think that the pungency of it is a drawback in First Amendment terms, that causes me some problems. Your Honor, the NAACP doesn't have any problem with the biting nature, the pungency, any of that. The NAACP has been the victim of far worse attacks than this. But where the line is crossed is where it causes consumer confusion. They are free to criticize. In fact, they did criticize NAACP in many other ways, including saying, a more fitting moniker for the NAACP would be to call it the National Association for the Abortion of Colored People. What do you do with the fact that the ACLU's brief in this case was very interesting to me? Because they point out that there are all kinds of riffs on the names of organizations and that the National Rifle Association has been said to stand for the National Republic Association and NBC stands for nothing but Caucasians and the ACLU stands for the Anti-Christian Lawyers Union. And I mean, this, you know, taking off or taking off on titles, it's a form of social commentary that has a long history. Sure, Your Honor. And if that was all that was going on, there wouldn't be a problem. But you have to look at this, Your Honor, we would submit in context. So if you had, for example, an editorial in the Wall Street Journal that said NAACP, colon, National Association for the Abortion of Colored People, and then had a bunch of text explaining this sort of thing, that may well not have resulted in the same level of confusion you have here. But you don't have that here. You have the title. It's followed by a prominent graphic that aligns the NAACP name with the campaign TooManyAborted.com. If you simply look at those things, it's much easier to understand how one could come away with, oh, well, the NAACP is a cosponsor of this TooManyAborted.com campaign. That's the sort of confusion that the expert survey detected when you have that confusion. Read one paragraph of the article, you don't get that at all. But part of the premise of the First Amendment, when you look at the way the marketplace of ideas is supposed to work, you represent an esteemed organization that has an honorable and iconic place in this nation's history. And it's precisely the more prominent and iconic the organization is, the more powerful a person is, the more a part of American tradition and dialogue and everything else the organization is, and you're weighing in on all kinds of issues here, there, and everywhere else. And that's your right. But it's also the right of people to take the most prominent organizations in this country and let fly. And that's what troubles me. And the more prominent the organization, the more resources it has to go combating speech and dispelling what you think and what I think are misimpressions. I think it's a cheap shot, what was done here. It's a cheap shot, but the marketplace is full of cheap shots. And, Your Honor, the NAACP is no stranger to cheap shots. That is not what's motivating this action. What's motivating it is the line that's crossed is when it causes confusion as to the NAACP's actual positions and affiliations with organizations. But what you just said is the confusion as to its actual positions. But there is a difference between confusion over positions, which is something that you clarify in the normal course of First Amendment debate, and confusion over product. And the difficulty I have here is that I don't think that Lanham Act confusion is directed necessarily at confusion over positions because people get confused over positions all the time. And this is not, this article was not a product identifier. And that's what Lanham Act confusion reflects. Your Honor, you're right. It's not just about positions. It's about affiliate. What the Lanham Act is about, though, is not simply product identification. It's about affiliation between speakers as well. There's two different components to Lanham Act. And what the source of confusion that the NAACP is concerned with here is confusion as to affiliation between the NAACP and Radiance. That is the actionable confusion. That is plainly actionable under bedrock trademark law where someone who uses a mark causes affiliation or a sense that they are affiliated with the trademark holder. That is undisputed, and they don't even dispute that that is actionable confusion. That's the type of confusion that was detected in the expert survey here. Thirteen percent found some affiliation or approval between the NAACP and the use of the marks here. That is the sort of confusion, not about whether NAACP supports abortion or not, position, First Amendment debate. That is all fine and good, Your Honor. That's not what the NAACP is objecting to. What they're objecting to is the confusion caused by this use of this mark that suggests they are affiliated with this group. That is something that the trademark law does not allow. Mr. Shaw, I'm sorry. No, you haven't had a chance. Mr. Shaw, does your brief contain a major typo? The not commercial speech? Yes, yes, there should be a not in that. You never corrected that, did you, or did you? That was a typo, Your Honor. You are right. It should say not commercial speech. Well, not non-commercial. Yes, not non-commercial speech, yes. What is your best argument? First of all, do you agree that even on this record we owe no deference to the district court's ultimate conclusion as to the commercial character of the speech here? Your Honor, as to the pure question, if you're talking about dilution, the dilution exceptions and non-commercial, I agree that this court can review that. That is primarily a legal question. It can review that de novo. But I would submit that that is a much more difficult ground to decide this case. If this court were to find trademark infringement, that would independently support the injunction below. So even if they were correct. We could get to infringement if it's non-commercial speech. Well, no, I would disagree, Your Honor, respectfully. Explain that. So in the trademark infringement statute, the non-commercial speech exception is only a statutory exception to dilution. The trademark infringement statute does not have any commercial speech, non-commercial speech requirement. Instead, Congress used broader words. It said in connection with the offering of goods and services. In connection with is the key statutory term that gets to that element in the trademark infringement statute. Now, in connection with, as this court recognized in Lampariello, has been interpreted quite broadly. Other circuits have rejected, for example, the Second Circuit that it maps right on to the commercial, non-commercial speech dichotomy. Congress knew how to say it has to be commercial speech to be covered. They did that in dilution. But they didn't do that in the infringement statute where they chose a much broader formulation in connection with the offering of services. And we think here we have that in connection with requirement. It's in connection with, one, there is the donate button. But even beyond the donate button, this organization provides. The whole thing you want us to embrace is that a news article critical of a particular organization that does not serve as a product identifier or source identifier is still in connection with goods and services rather than in connection with social commentary or political speech. Your Honor, they're not mutually exclusive. You can have commentary. And the Second Circuit said this. The fact that something is commutative on protected speech ideas does not insulate it from the in connection with requirement. It can both be speaking to social commentary. But at the same time, this has a link. This posting has a link to their offering of billboard services, licensing the very type of billboard artwork that's featured in the posting itself for $950. So there's no way to avoid the constitutional question here is your argument? Well, Your Honor, we think the constitutional, the right way to analyze this. But your answer, I think, to my question is there is no way to avoid the constitutional question. Your Honor, the constitutional question that you posed is, is this commercial versus non-commercial speech? I would submit there's no need to reach that question because if you decide this case on the trademark infringement ground, that is not a requirement for trademark infringement. That goes to dilution. Now, here's how I think the constitutional considerations, the First Amendment considerations come into play. If you look at the Eighth Circuit's decision in Anheuser-Busch, I think that provides a perfectly good framework in which to do this. This court applied it in PETA as well, which if you look, is it in connection with the offering of goods and services here? They have a link. Suppose we say this is not in connection with goods and services. Well, this is not likely to cause confusion. Then that knocks the case out on Lanham Act grounds. Would we still need to reach a First Amendment? Your Honor, no. If you found that this did not, this was this entire sort of. There's no Lanham Act cause of action here because it wasn't in connection with goods and services. And it's only if we find a Lanham Act violation, isn't it, that we go to the constitutional question? You are right. If you found that it wasn't in connection with, but I would submit that would both be in conflict with the terms. You want us to get to the constitutional question because you want us to find a Lanham Act violation. Then we have to reach the question of whether the Lanham Act has been constitutionally applied. Well, Your Honor, I think those inquiries go hand in hand. In applying the Lanham Act, there are First Amendment considerations to be taken into account. The way you do it is, I think, how the Eighth Circuit did in Anheuser-Busch. That is, first, you answer the statutory question. Does it fit in connection with the offering of. . . There is a link, and I agree with you on that point. But don't we need to interpret the statutory phrases in connection with and likelihood of confusion in pari materia with First Amendment values? I mean, it seems to me we don't want a train wreck between the Lanham Act and the First Amendment if we can avoid it. And the way you, I think, avoid that is to say that these two prongs we are talking about here, the likelihood of confusion and the in connection with element, have to be applied sensitively with respect to the requirements of the First Amendment. And you can knock the Lanham Act action out under that way simply by taking the view that First Amendment values do play a part in Lanham Act application. I think they do, Your Honor, but I think the way to do it is the way the Eighth Circuit has done it, the way the Second Circuit has done it, which is this. You apply the terms of the statute in connection with offering the sale of goods and services. Those requirements construed in terms of their plain terms, the fact that they're linking to the sale of the very billboard work that they're promoting in the posting itself would satisfy that test. Now, that is not the end of the inquiry. There is still a likelihood of confusion standard to be applied. That is where courts have applied the First Amendment consideration, not conflating those two requirements. The first requirement is, are you within the world of the Lanham Act? If you're within that broad world of the Lanham Act that Congress has set forth, now let's apply the likelihood of confusion standard sensitive to the First Amendment considerations. Is that consistent with the avoidance canon? Yes, Your Honor, because you're going to apply the likelihood of confusion standard with the First Amendment in mind to avoid violating the First Amendment. Now, how do you do that? Well, you ask the question, as this Court did in PETA, as the Eighth Circuit did in the Anheuser-Busch case, that, well, is this the type of social commentary that, for example, falls within parity? You know, it had 30 links. It was a domain name, and it had 30 links to 30 commercial websites. I mean, isn't that distinguishable from what you have here, which is you have a donate button which encourages people to give to an organization because they share the organization's views on an issue that isn't particularly commercial. It has to do with an ideological issue that is hotly debated within this country, on which people can legitimately feel different ways. Sure, Your Honor, but it's not just the donate button. They have a link on their website to sell the artwork that is displayed in this posting. That's to license it. Yeah, the billboards still are in relation to social commentary. That may well be true, but there is no immunity under the infringement portion of the statute for noncommercial speech. It may be well in connection with social commentary. I don't dispute that. But it's also a financial commercial transaction. You want to drive us into this First Amendment question, where if we agree with you on the Lanham Act, we confront the First Amendment question head on? Well, Your Honor, by ignoring the First Amendment— Is that where you're driving this? Well, Your Honor, I'm driving you to apply the Lanham Act as it's written. If you apply it as it's written and say you're not even going to look at the First Amendment to avoid getting into that area, then you would be conflicting with the terms of the act and in conflict with how other circuits have interpreted the statute. The in connection with requirement, as my friend on the other side suggested, has been interpreted very broadly. Congress consciously used broad terms, in connection with, because that is just the initial prong to get you within the Lanham Act. Then the likelihood of confusion standard is what does the work in the analysis in terms of First Amendment considerations. Even the cases that they cite about titles and whatnot, that is applying the First Amendment considerations through the likelihood of confusion standards. So I don't think you can avoid applying the Lanham Act as written. Counsel, I totally understand your argument, and I've read the Fourth Circuit cases you're talking about, that yes, we construe in connection with very broadly. Even the district court in this case really, in connection with, was separate from the First Amendment considerations, which did come in when you're looking at confusion. What I actually want to ask you is the district court in connection with confusion, and then at the very end said, now, separately, I'm going to balance this under the First Amendment. Here is my concern, and not to complicate your life further, but in doing that balancing, the district court kind of said, well, I'm not going to weigh the First Amendment side as heavily as I otherwise might because it's commercial. This is commercial commentary. So it sort of came in at the back end there. Now, does that have to be right for you to win? No, I don't think so. I think the court certainly reached the right result. I think I would do it, as other circuits have done, like the Eighth Circuit, like this court did in PETA, is to do it in the likelihood of confusion inquiry. For example, is this parity? Apply the parity test. And, of course, the district court has found, no, this isn't parity because when you look at that, it doesn't convey the other message clearly enough that this is, in fact, not the NAACP. And, in fact, they have not raised it. If you read their opening brief, they don't mention parity at all in their brief except when quoting the statute. That was their primary argument at trial, and they don't make it here on appeal. I see that my time has run out, so if there are no further questions. I'll call my friends here if they have further questions of you. Judge Harris? Thank you. Thank you, Your Honor. Mr. Allen, you have some rebuttal time, sir? I do, Your Honor. First, I would like to address the argument that in connection with has no constitutional dimension. It has no relevance to the First Amendment issues that are before the court. I would submit it does. As a matter of fact, the very reason why several circuits have adopted the commercial-noncommercial dichotomy, Taubman v. Webfield in the Sixth Circuit, Osley v. Kramer in the Ninth Circuit, Utah Lighthouse in the Tenth Circuit, Ferra in the D.C. Circuit, all of those courts have found this commercial-noncommercial speech dichotomy to decide whether or not in connection with is satisfied, precisely because they want to avoid running into the issue of the First Amendment. Now, this circuit has not gone that far. It has never said that commercial speech is in connection with and noncommercial speech is outside. But those cases should nevertheless inform where the outer limit is. And if the speech is entirely social commentary, if the speech is the use of the marks, not in relation to any goods and services, but simply to say they're bad people or we don't agree with their position or whatever. But you really have to rely on Village of Schomburg, don't you? And because the court there has said if it's a charitable solicitation and a charitable ideological or political solicitation or whatever, that that is not commercial speech. I agree that that is also a reason to say the donate button does not, in this particular case, make it in connection with. But I don't agree that that's the only reason. But it's one reason. It is one reason, absolutely. I just want to understand. It just seems to me that this would be very far-reaching, and I'm having trouble thinking of a hypothetical. But if you assume for a moment, just assume, that there were a real possibility of confusion here, that say the article wasn't here and it just said NAACP, say there's no article, it's just the graphics, just the headline, and people could be genuinely confused. They don't read it carefully. There's no article to read to put it in context. Oh, I thought the NAACP wanted me to donate here because they're affiliated with the Radiance Foundation. It's like the Ink Fund. It's just another part of the NAACP. I like the NAACP. I'm donating. If there were a survey that said 50% of people have that confusion, you're saying that's fine. They're allowed to use the NAACP name. They're allowed to link it to their donate button. They're allowed to take those donations. They're earning money off the NAACP's name, even though they are not in any way affiliated with the NAACP. We can't reach that under this act? It's unclear to me, Your Honor, whether or not your hypothetical is that the URL is something other than the NAACP. Let's make the URL whatever you want, but you're still saying it's social commentary. It's simply not covered by this act. If it is social commentary and criticism, it is covered. It is covered. And I agree that Schomburg protects the donate button, and if we're making commentary about social criticism and commentary, your hypothetical is difficult because it makes it difficult to say that it is social commentary and criticism. Well, you have the headline in the billboard. You have the headline in the billboard here, just no article that would put them in context and clear up any confusion. In that circumstance, it may very well be that a court might say that's not social criticism and commentary. Why not? It's NAACP, National Association for the Advanced Abortion of Colored People. It may be or it may not be. I'm not certain about that circumstance. I can imagine circumstances where there is genuine and intentional confusion so that you are trading off some other organization's good name in order to raise money. And I am concerned that the rule you are asking for, that if you can call it social commentary, it is per se outside the scope of this act, is distressingly broad. I don't believe it's distressingly broad because it requires that there – it's simply – all I am arguing for is a rule that requires a nexus between the mark and some good or services that is being offered. But isn't your point – isn't your response – I think Judge Harris raises a very good question. And part of your response would have to be is that the record here doesn't reveal that level of confusion. And there could – but there are cases where the dangers that my good colleague points to could be realized. And your answer is that that hasn't been met here, but a different case raises different questions. I agree, Your Honor. And there's a value in narrowness and avoiding constitutional questions and all these – The confusion that counsel is arguing, by the way, is initial interest confusion, which is this court has always said is not here. We don't find that confusion. So if people quickly get to the website, see the graphic, and say, I'm confused. But as I understand it, we're talking about the article here and not a billboard, which could be a little more problematic, but – It's not a billboard. We've been pretty crisp on the time. So thank you, and thank you both. And we will come down and greet counsel and move into our next case. Is that okay?
judges: J. Harvie Wilkinson III, Pamela A. Harris, Andre M. Davis